UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
GLORIA HALCOMB,                         )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )          Civil Action No. 02-1336 (PLF)
                                        )
NOPADON WOODS,                          )
                                        )
          Defendant.                    )
_____)


OPINION

          In November of 2009, plaintiff Gloria Halcomb presented to a jury her claims that

defendant Nopadon Woods was liable to her for false arrest, assault, battery, intentional infliction

of emotional distress, and violations of her Fourth Amendment rights.  The jury found in Ms.

Halcomb's favor as to most of those claims and awarded her $75,000 in compensatory and

$175,000 in punitive damages.  This matter is now before the Court on Mr. Woods' motion for

judgment as a matter of law or, alternatively, for a new trial.  Mr. Woods argues that (1) he is

entitled to judgment as a matter of law on Ms. Halcomb's common law claims of false arrest,

assault, and battery, and on her Section 1983 claim of unconstitutional arrest; (2) no reasonable

jury could have awarded punitive damages based on the evidence presented at trial; and

(3) qualified immunity shields him from liability for unconstitutional search and arrest.  The

Court will grant Mr. Woods' motion in part and deny it in part, vacating the jury's award of

punitive damages but leaving the remainder of its verdict unchanged.[1]

_____

          [1]     The filings considered by the Court on this motion include:  Mr. Woods' renewed
motion for judgment as a matter of law or, alternatively, for a new trial ("Mot."); Ms. Halcomb's

# I. BACKGROUND

## A. Procedural History

Ms. Halcomb's complaint, filed on July 1, 2002, originally contained claims against Mr. Woods, the Washington Area Metropolitan Transit Authority ("WMATA"), and the District of Columbia. See Compl. ¶¶ 6-8. Against Mr. Woods, Ms. Halcomb pled claims of false arrest, assault, battery, intentional infliction of emotional distress, and violations of 42 U.S.C. § 1983. Id. ¶¶ 37-48, 52-56. She claimed that WMATA was liable under the theory of *respondeat superior* for the allegedly tortious actions of Mr. Woods. Id. ¶¶ 49-51. In addition, she asserted a claim of intentional infliction of emotional distress against the District of Columbia, alleging that the District was vicariously liable for the actions of several unidentified officers of the District of Columbia Metropolitan Police Department. Id. ¶¶ 60-63. She also sought to hold the District of Columbia liable for Mr. Woods' alleged violations of 42 U.S.C. § 1983. Id. ¶¶ 64-67. Ms. Halcomb requested compensatory damages in the amount of at least $75,000 and an unspecified amount of punitive damages. Id. at 12.

At Ms. Halcomb's request, her claims against WMATA were dismissed in September of 2002. On March 13, 2003, on the District of Columbia's motion, the Court dismissed Ms. Halcomb's Section 1983 claims against the District. Halcomb v. Wash. Area Metro. Transit Auth., Civil Action No. 02-1336, Order at 1-2 (D.D.C. Mar. 14, 2003). Ms. Halcomb's remaining claims against the District of Columbia and Mr. Woods were tried to a jury

---

opposition to Mr. Woods' motion ("Opp."); Mr. Woods' reply to Ms. Halcomb's opposition ("Reply"); Ms. Halcomb's motion to strike portions of Mr. Woods' reply ("Mot. to Strike"); Mr. Woods' opposition to that motion ("Def.'s Opp."); Ms. Halcomb's complaint ("Compl."); and the instructions provided to the jury on November 6, 2009 ("Jury Instructions").

beginning on December 10, 2007.  After eight days of trial and nearly two days of deliberations, the jury was unable to reach a verdict, and the Court declared a mistrial.  Although the jury had failed to reach a decision on Ms. Halcomb's claims, the defendants filed a motion for judgment as a matter of law, which was granted as to the District of Columbia but denied as to Mr. Woods.  See Halcomb v. Woods, 610 F. Supp. 2d 77, 87 (D.D.C. 2009).  Ms. Halcomb's claims against Mr. Woods were tried again before a jury in November of 2009.  After five days of trial and nearly three days of deliberations, the jury returned a verdict for Ms. Halcomb on a number of her claims.

*B.  Evidence Presented at the Second Trial*

The evidence presented by the parties at trial must be understood in light of the undisputed facts about the manner in which the District of Columbia's subway system, called "Metro," operates.  A passenger may reach a Metro train platform only after first passing through a barrier called a faregate.  To open a faregate, a passenger must either touch a plastic card, called a SmarTrip card, to an electronic sensor located on top of the gate, or insert a paper card, called a farecard, into a slot located on the side of the gate.  The card — whether made of paper or plastic — is electronically encoded with a monetary value.  If that value is equal to or higher than the minimum fare needed to ride a Metro train, the faregate will open after electronically "reading" the card.

1.  The Plaintiff's Evidence

Ms. Halcomb testified as follows at the second trial:  On October 30, 2001, at around 6 p.m., she left the United States Capitol building, where she worked, and walked to

Union Station to catch a Metro train.  She inserted a paper farecard containing sufficient fare to enter the Metro system into a faregate and passed through the gate after it opened.  Once in the area of the station reserved for Metro passengers, she then proceeded to a bank of pay phones and called Sam Taylor, a friend whom she was scheduled to meet for dinner that night.  While she was on the phone, she was approached by Mr. Woods, at the time an officer of the WMATA Metro Transit Police.  He informed her that her farecard did not have sufficient monetary value to trigger the faregate and asked Ms. Halcomb to give him the card.  Once she had done so, he carried the farecard to a nearby kiosk.  Ms. Halcomb did not see what he did there.

When Mr. Woods returned from the kiosk, he said that he had checked the value of Ms. Halcomb's card and confirmed that it was below the minimum value needed to enter the Metro system.  Ms. Halcomb denied this claim and asked if Mr. Woods would accompany her to a fare machine so that they could check the value of the card together.  He refused her request and retained possession of the farecard, informing Ms. Halcomb that he was going to write her a citation for fare evasion.[2]  He asked to see her identification.  After at first refusing to provide identification, Ms. Halcomb showed him a media credential and a work identification card, but Mr. Woods rejected those and asked for a different form of identification, one with her photograph on it.  He then reached for Ms. Halcomb's purse, whose straps Ms. Halcomb was holding with her right hand.  Saying that he was sure there was identification in her bag, Mr. Woods grasped two of Ms. Halcomb's fingers, bent them back, and held onto them for a couple of seconds.

---

[2]     Fare evasion is defined by statute as follows: "No person shall . . . knowingly enter or leave the paid area of a real transit station owned and/or operated by [WMATA] . . . without paying the established fare . . . ."  D.C. CODE § 35-216.

Ms. Halcomb told Mr. Woods to let go of her hand. He did so, and she withdrew her wallet from her purse and showed him her driver's license. Mr. Woods then called another police unit on his radio and read off Ms. Halcomb's identifying information. He told Ms. Halcomb that he was going to issue her a citation. Ms. Halcomb still denied that she had done anything wrong and insisted that he show her the farecard he had taken from her. He refused to do so. Ms. Halcomb's fingers, the ones that Mr. Woods had bent back while trying to obtain her driver's license, were beginning to swell. She complained to him that he had injured her and warned him that she would file a complaint against him. Mr. Woods told her that if she wanted medical treatment, he would have to take her D.C. General Hospital, and that she would also have to "go to jail" first in order to get medical attention.

At that point, Mr. Woods put a hand cuff on Ms. Halcomb's right wrist and then "yanked" her right arm behind her back to complete the process of handcuffing her, injuring her arm and shoulder in the process. Once Ms. Halcomb was handcuffed, Mr. Woods put on rubber gloves and began to search her and collect her property. He roughly pulled off her earrings and, in trying to remove her necklace, twisted it in such a way that it broke. He also ripped her belt from her trench coat. Then he put his knee between Ms. Halcomb's legs to push them apart, bruising them in the process, and searched her front, back, and sides. He "stomped" on Ms. Halcomb's right foot.

At the conclusion of the search, an officer from the District of Columbia Metropolitan Police Department arrived on the scene, and he and Mr. Woods placed Ms. Halcomb in a patrol car outside Union Station. Ms. Halcomb was driven to a police precinct and led inside. Somehow during all of this, Ms. Halcomb said, her blouse had come open, exposing

her breasts, and officers and prisoners in the precinct taunted her as she was led past them. She was locked in a cell for an unspecified number of hours, until she was removed from the precinct and taken to D.C. General Hospital by Mr. Woods and another officer.

At D.C. General, Ms. Halcomb was placed in another cell while she waited to receive medical attention. Ms. Halcomb was so horrified by the dirty condition of the cell that she urinated on herself rather than use the toilet provided. Her hand and foot pained her, and at some point she vomited. After she had been in the cell for some time, Mr. Woods arrived and took her to be treated by a physician. Before seeing the doctor, Ms. Halcomb spoke with a nurse, who asked her some questions and recorded her contact information on a medical form. When Mr. Woods saw the address that was written on the medical form, he said something along the lines of, "Now that I know where you live, I ought to come out there and put a bullet in your head for making me go through all this [expletive] with you tonight."

A physician ordered x-rays of Ms. Halcomb's right hand and foot but found no fractures of her bones. On Ms. Halcomb's medical forms, he wrote that she had a contusion (bruise) on her right hand and instructed her to use compresses and Motrin to treat the injury. After the doctor's examination of Ms. Halcomb had ended, Mr. Woods took her back to the cell where she previously had been placed. At about 5:00 a.m. on the morning of October 31, 2001, she was driven to another police precinct, where she was photographed, fingerprinted, and placed in another cell. She was released later that morning, at about 7:30 a.m., after her friend Sam Taylor paid her fine. At the time, she had pain in her shoulder, foot and hand, and her thighs were bruised.

After Ms. Halcomb finished testifying, her counsel called several supporting witnesses. Ruth Enoch, a friend of Ms. Halcomb's, testified that Ms. Halcomb had been very upset after her experience with Mr. Woods. A former New York City police captain, Edward Mamet, appeared as an expert witness and testified regarding the standards governing police behavior during investigations and arrests. Ms. Halcomb's doctor, Danny Mamodesene, testified that Ms. Halcomb came to see him on November 1, 2001, claiming that she had been injured during a confrontation with a police officer and complaining of injuries to her right hand, right foot, and both thighs. Dr. Mamodesene diagnosed Ms. Halcomb as having a right wrist "sprain/contusion," a shoulder sprain, and bruises on her right thigh and ankle, along with insomnia and anxiety.

Sam Taylor, Ms. Halcomb's friend, testified that he had gone to Union Station on the evening of October 30, 2001, after hearing over the phone the beginning of Ms. Halcomb's confrontation with Mr. Woods.[3] According to Mr. Taylor, he arrived at Union Station after Ms. Halcomb had already been handcuffed and searched by Mr. Woods. Ms. Halcomb was crying and told Mr. Taylor that Mr. Woods had bent back her fingers and stomped on her foot. She seemed to Mr. Taylor to be in great pain. She insisted on getting medical treatment for her injuries, prompting a police officer who was standing with Mr. Woods and Ms. Halcomb to inform Mr. Taylor that the police could only get Ms. Halcomb medical treatment by taking her to D.C. General Hospital, and could only do that if Ms. Halcomb was under arrest.

---

[3] Mr. Taylor passed away between the first and second trials of Ms. Halcomb's claims. His sworn testimony from the first trial was read into the record at the second trial by a professional actor hired by plaintiff's counsel.

Once Ms. Halcomb was removed from Union Station by the officers, Mr. Taylor tried to find out where she had been taken. Eventually he found her at the New York Avenue police substation, where he paid Ms. Halcomb's fine, and she was released.

## 2. The Defendant's Evidence

Unsurprisingly, Mr. Woods related an account of his confrontation with Ms. Halcomb that differed dramatically from hers. He testified that he had stood in the kiosk in Union Station on October 30, 2001, monitoring the faregates. Through the transparent windows of the kiosk, he could see people passing through the gates. He could also look down at a machine called the "System Monitor Acknowledgment Display" ("SMADS machine"), which displayed on a screen the information encoded on the cards being used at the faregates. When Ms. Halcomb approached a faregate, Mr. Woods noticed that although she was using a paper farecard, which must be inserted into a slot on the side of a faregate to be processed, she swiped the card across the top of the faregate as if it were a plastic SmarTrip card. She then "piggybacked" through the faregate by slipping through the gate behind another person before it closed behind the person who had entered in front of her. Mr. Woods, believing that Ms. Halcomb had evaded paying her fare, glanced down at the SMADS screen and saw that no SmarTrip card had been used at the faregate through which she had just passed.

Convinced that Ms. Halcomb had entered the Metro system illegally — he said he had "reasonable suspicion" at this point — Mr. Woods approached her and asked for her farecard. After she handed it to him, he took it to the kiosk, where he inserted it into the SMADS machine. According to the machine, the card had not been used to enter a Union Station faregate

that evening; the last place of entry encoded on the card was Glenmont station. Mr. Woods concluded that Ms. Halcomb had not paid her fare when she passed through the faregate and believed he then had probable cause to believe she had committed the offense of fare evasion. Mr. Woods returned to the place where Ms. Halcomb was standing, asked her for a form of identification, and informed her that he was going to issue her a citation for fare evasion. Ms. Halcomb denied that she had done anything wrong, refused to give Mr. Woods any identification, and walked off toward a bank of pay phones to make a call. Mr. Woods followed her and again asked for a form of identification or for identifying information. He advised her that he needed certain information, including her name and address, in order to issue her a citation for fare evasion. When Ms. Halcomb refused to provide identification after Mr. Woods' third request, he told her that he would have to arrest her if she refused to identify herself, and he showed her his handcuffs.

Ms. Halcomb continued to refuse to provide any information about her identity. Mr. Woods then attempted to place her in handcuffs. She resisted, pulling away from him and twisting from side to side; they struggled. Ultimately, Mr. Woods was forced to obtain assistance from another Metro Transit police officer, Spencer Pines, before he was able to close the handcuffs around both of Ms. Halcomb's wrists. Mr. Woods then performed a search of Ms. Halcomb. He removed her jewelry and belt without damaging either. He said he did not intentionally stomp on her foot and did not bend her fingers back.

Eventually, after waiting at Union Station for a transport vehicle for roughly ninety minutes, Mr. Woods took Ms. Halcomb to D.C. General Hospital because she was complaining of injuries. Once at the hospital, he informed personnel there that he had brought in

a prisoner who required medical attention. After Ms. Halcomb was registered as required by the hospital, Mr. Woods took her to a cell for arrestees/prisoners that is maintained and monitored by the District of Columbia Metropolitan Police Department. Sometime later Ms. Halcomb was seen by a physician and x-rays were taken, after which she was returned to the cell. Later Mr. Woods took her to the Third District Metropolitan Police Department station to be booked and placed in a cell. She was released later that morning after Sam Taylor paid her fine. Mr. Woods denied ever threatening to come to her house and "put a bullet in [her] head."

To support his testimony, Mr. Woods produced a paper farecard that he identified as the one given to him by Gloria Halcomb on the night in question. He testified that, as was standard practice for transit police officers, he had kept the card in a filing cabinet at his home since that night. His counsel introduced in evidence a photograph of the information displayed on the screen of a SMADS machine when the card was inserted into the machine approximately two years after Ms. Halcomb's arrest. She also introduced a second, more recent photograph of the information displayed by a SMADS machine when the card was inserted. Mr. Woods testified that both photographs showed what the SMADS machine had shown him on October 30, 2001: that the card had not been used to enter the Metro system at Union Station that evening.

Mr. Woods' testimony was followed by that of three other individuals: Paul Mazzei, an expert on police procedures; Jonathan Strong, a Metro technician who explained the operation of the SMADS machines; and Spencer Pines, the other Metro transit officer who was in Union Station on the evening in question.

3.  The Jury's Verdict

The jury found in favor of Ms. Halcomb on her common law claims of assault, battery, and false arrest, but rejected her claim of intentional infliction of emotional distress.  See Verdict Form, Docket No. 184, at 1.  With regard to Ms. Halcomb's additional claim under 42 U.S.C. § 1983, the jury was asked to answer the following questions, with the understanding that an affirmative answer as to any one of them would mean that Ms. Halcomb had established a Section 1983 violation:

Do you find that Gloria Halcomb has proven a claim under the United States Constitution against Nopadon Woods for any of the following acts:

A.      Unreasonable seizure?

B.      Unreasonable arrest?

C.      Unreasonable search?

D.      Excessive use of force?

Id. at 2.  The jury found that Ms. Halcomb had proven an unreasonable arrest and an unreasonable search, but not an unreasonable seizure or excessive use of force.  Id.

Having found for Ms. Halcomb on four of her claims, the jury awarded her $75,000 in compensatory damages and $175,000 in punitive damages.  Finally, since it had found for Ms. Halcomb on her constitutional claim, the jury was asked to respond to three special interrogatories.  This was done in order to assist the Court in deciding the issue of qualified immunity.  The jury answered as follows:

Do you find that Nopadon Woods:

1.      Bent Gloria Halcomb's fingers back?                Yes

| | | |
|---|---|---|
| 2. | Used excessive force in applying Ms. Halcomb's handcuffs? | No |
| 3. | Stomped on Ms. Halcomb's foot in the manner claimed by Ms. Halcomb? | No |

Verdict Form at 4.

### C. Post-Trial Motions

Mr. Woods made a Rule 50 motion at the close of plaintiff's case and again at the close of all the evidence. The Court denied the motion on both occasions. After entry of judgment based on the jury's verdict, Mr. Woods filed the pending motion for judgment as a matter of law or, in the alternative, for a new trial. Ms. Halcomb filed a memorandum in opposition to that motion, and Mr. Woods in turn replied to that opposition. Ms. Halcomb has since filed a motion to strike Mr. Woods' reply memorandum on the ground that it contained new arguments not presented in the post-trial motion itself, Mot. to Strike at 1, which Mr. Woods opposes. Because Mr. Woods has moved for two alternative forms of relief — judgment as a matter of law or a new trial — the Court addresses them separately, beginning with the defendant's request for a new trial.

### II. MR. WOODS' REQUEST FOR A NEW TRIAL

Mr. Woods asserts that a new trial is warranted under Rule 59 of the Federal Rules of Civil Procedure on either one of two grounds: (1) "the jury's verdict is inherently inconsistent"; and/or (2) the Court erred in refusing to allow Mr. Woods to present evidence that Ms. Halcomb previously had received a citation for fare evasion in 2000. Mot. at 20-21. For the reasons given in open court on November 3, 2009, and in the Memorandum Opinion and Order

issued on October 30, 2009, the Court rejects the second argument. See Halcomb v. Woods, Civil Action No. 02-1336, Memorandum Opinion and Order at 2-3 (D.D.C. Oct. 30, 2009). As for the first, the defendant has failed to identify any aspects of the jury's verdict that are so inconsistent as to justify a new trial.

"Claims that a jury verdict is internally inconsistent impose a special obligation on the court to view the evidence in a manner that reconciles the verdicts if possible, and to grant a new trial if not." Hundley v. District of Columbia, 494 F.3d 1097, 1102 (D.C. Cir. 2007). "[S]uccessful claims of verdict inconsistency are rare," arising only when the jury has reached conclusions that "cannot reasonably be reconciled or sustained." Id. Here, the defendant claims that the jury's verdict was inconsistent in three ways: (1) the jury "found no excessive force in the constitutional context and no intentional infliction of emotional distress, yet nonetheless awarded punitive damages"; (2) "the jury found no unreasonable seizure, but found false arrest and unreasonable search"; and (3) the jury's "finding of unreasonable arrest is inconsistent with a verdict for defendant on unreasonable seizure." Mot. at 20.

The defendant's first argument — that the jury's award of punitive damages is inconsistent with its rejection of Ms. Halcomb's claims of excessive force and intentional infliction of emotional distress — makes little sense. The jurors were given an instruction on the law of punitive damages — agreed to by the parties — that reflected the law in the District of Columbia and was not limited to any particular claims in the case. See Jury Instructions, Docket No. 180, at 86-89. Under District of Columbia law, "punitive damages are available in actions for intentional torts." Oliver v. Mustafa, 929 A.2d 873, 878 (D.C. 2007). The jury found Mr. Woods liable for three such torts: assault, battery, and false arrest. Any one or more of those

torts could have provided the foundation for the jury's award of punitive damages, and the defendant has not made any attempt to explain why a finding of excessive use of force or liability for intentional infliction of emotional distress should have been a necessary predicate for that award.

The logic underlying the defendant's other arguments is similarly dubious. As a legal matter, it is true that a finding of unconstitutional arrest is incompatible with a finding of no unconstitutional seizure; an arrest, after all, *is* a seizure within the meaning of the Fourth Amendment. See, e.g., California v. Hodari D., 499 U.S. 621, 624 (1991). That fact, however, was not reflected in the jury instructions developed jointly by the parties and presented to the jury. Those instructions did not even include a full definition of what a constitutionally unreasonable seizure — as distinct from a constitutionally unreasonable arrest or excessive use of force — might be. The only instructions presented to the jury concerning unreasonable seizure as a constitutional claim independent of unreasonable arrest or excessive use of force consisted of the following:

UNCONSTITUTIONAL CONDUCT – UNREASONABLE
SEIZURE DEFINED[4]

The Fourth Amendment to the United States Constitution protects persons from being subjected to unreasonable seizures by the police. A law enforcement official may only seize a person if there is appropriate justification to do so. In this case, Plaintiff Halcomb claims that she was not free to leave Union Station due to Defendant Woods' conduct and that such conduct was

_____

[4]   The heading for this instruction and the following instruction was not read to the jury; only the text was. As is the Court's practice, however, a written copy of the instructions was sent to the jury room for ready reference during deliberations, and this written set of instructions contained the headings.

unreasonable and not justified. She alleges that she was subjected to an unlawful seizure under the Constitution.

I will now give you more details on what constitutes a "seizure" and on how to decide whether a seizure is unreasonable under the circumstances.

## UNCONSTITUTIONAL CONDUCT – UNREASONABLE SEIZURE

A "seizure" occurs when a police officer restrains a person in some way, either by means of physical force or by a show of authority that the person obeys. A person is "seized" within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to ignore a police presence and leave. In deciding whether a seizure has occurred under this test, you may consider circumstances such as whether the officer physically touched the person, whether the officer physically displayed a restraining device, and the officer's use of language or tone of voice.

Jury Instructions at 66-69. Glaringly absent from these agreed upon instructions is any definition of reasonableness or any explanation of the distinction between a reasonable seizure and an unreasonable one. The instructions formulated by the parties thus left the jury an incomplete and potentially confusing discussion of the concept of an unreasonable seizure.[5]

At worst, the legally contradictory findings of unreasonable arrest but no unreasonable seizure reveal that the jury may not have fully understood the meaning of the claim for unreasonable seizure as distinct from the plaintiff's other constitutional claims. Mr. Woods has identified no reason to believe, however, that the jury did not understand and correctly apply

---

[5]     Immediately following the above instructions, the Court instructed the jury on arrest without probable cause, unreasonable search, and excessive use of force. See Jury Instructions at 70-76. All three of those categories of claims are described in detail, but without any mention of the relationship of excessive use of force or arrest without probable cause to unreasonable/unconstitutional seizure.

the much clearer and more complete instructions regarding unconstitutional arrest, unconstitutional search, and excessive use of force that were given. See CSX Transp., Inc. v. Hensley, 129 S.Ct. 2139, 2141 (2009) ("[J]uries are presumed to follow the court's instructions."). The Court therefore rejects Mr. Woods' claim that a new trial is necessary on the ground that the jury's finding of unreasonable arrest was irreconcilably inconsistent with its finding of no unconstitutional seizure.[6]

The Court also rejects the assertion that the jury's finding of no unreasonable seizure is inconsistent with its finding in response to a special interrogatory, that Mr. Woods did bend back Ms. Halcomb's fingers back, as she alleged. According to Mr. Woods, "[t]here was no other claim for unreasonable seizure, separate and apart from the arrest, other than the 'bending of [Ms. Halcomb's] fingers.'" Mot. at 20. This argument is both confusing and unsupported by any reference to the trial record. To the Court's knowledge, the jury had no reason to suppose that a finding on unreasonable seizure was equivalent to or wholly dependent upon a finding on whether Mr. Woods had bent back Ms. Halcomb's fingers. Those two findings do not indicate any confusion or inconsistency on the part of the jury that would justify the grant of a new trial.

---

[6]     It is worth noting that at the conclusion of the instructions, the Court called counsel to the Bench to ask if they had any objections to the instructions just given. Other than to incorporate earlier objections by reference — none of which relates to the issues raised in defendants' request for a new trial — there were none.

III. SUFFICIENCY OF THE EVIDENCE SUPPORTING THE VERDICT

Mr. Woods also argues for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. He maintains that the jury's verdict should be set aside in whole or in part because (1) no reasonable factfinder would have returned a verdict in Ms. Halcomb's favor with regard to her claims of false arrest, unconstitutional arrest, unconstitutional search, common law assault, or common law battery, Mot. at 2, 6; and (2) a reasonable factfinder could not have found by clear and convincing evidence that Ms. Halcomb is entitled to punitive damages. Mot. at 16. While the first of these arguments is unconvincing, the second has merit.

*A. Standard of Review*

After a jury trial, the Court may grant a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure only if it finds that "a reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on that issue[.]" FED. R. CIV. P. 50(a)(1). Judgment as a matter of law is proper, "considering the evidence in the light most favorable to the [non-movants] and making all reasonable inferences in their favor," if the Court concludes that there is no legally sufficient evidentiary basis for a reasonable jury to have found in their favor under controlling law. Hendry v. Pelland, 73 F.3d 397, 400 (D.C. Cir. 1996); see Fox v. District of Columbia, 990 F. Supp. 13, 19 (D.D.C. 1997). The jury's verdict must stand "unless the evidence, together with all inferences that can be reasonably drawn therefrom is so one-sided [in favor of the moving party] that reasonable persons could not disagree on the verdict," Milone v. Washington Metropolitan Area Transit Authority, 91 F.3d 229, 231 (D.C. Cir. 1996), that is, unless the non-movant's evidence is so insufficient that a

reasonable finder of fact "could not possibly find for the non-movant." 9 MOORE'S FEDERAL PRACTICE § 50.60[1] at 50-87 (3d ed. 2002). <u>Accord</u> <u>Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.</u>, 493 F.3d 160, 165 (D.C. Cir. 2007); <u>McGill v. Munoz</u>, 203 F.3d 843, 845 (D.C. Cir. 2000); <u>Lloyd v. Ashcroft</u>, 208 F. Supp. 2d 8, 11 (D.D.C. 2002).

In deciding a motion for judgment as a matter of law, the Court is not to resolve legitimately disputed issues of fact already decided by the jury. 9 MOORE'S FEDERAL PRACTICE § 50.60[1] at 50-87 (3d ed. 2002). Even if the Court finds the evidence that led to the jury verdict unpersuasive, or that it would have reached a different result if it were sitting as the fact-finder, that is not a basis for overturning the jury's verdict and granting judgment as a matter of law. <u>Id</u>. The Court may not grant the motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." <u>Me, Inc. v. Taylor</u>, 157 F.3d 139, 142 (2d Cir. 1998).

As the Supreme Court has explained, at the Rule 50 stage, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 151 (2000) (internal quotation marks and citations omitted).

*B. False Arrest and Arrest in Violation of the Fourth Amendment*

The jury returned verdicts in Ms. Halcomb's favor on her common law claim of false arrest and her constitutional claim of unreasonable arrest in violation of the Fourth Amendment. <u>See</u> Verdict Form at 1-2. Under District of Columbia common law, "the focal point of [an] action [for common law false arrest] is the question whether the arresting officer was justified in ordering the arrest of the plaintiff." <u>Scott v. District of Columbia</u>, 101 F.3d 748, 754 (D.C. Cir. 1996). The jury was instructed that a person commits a false arrest at common law "when he intentionally detains or retains another, for any length of time, whether by actual force or threat of force, *without legal justification*." Jury Instructions at 47 (emphasis added). Thus, a false arrest claim cannot succeed if "the arresting officer had probable cause to believe that the arrestee committed a crime." <u>Scott v. District of Columbia</u>, 101 F.3d at 754. "Generally, probable cause exists where the facts and circumstances within the arresting officer's knowledge . . . are sufficient in themselves to warrant a reasonable belief that an offense has been or is being committed." <u>In re T.H.</u>, 898 A.2d 908, 913 (D.C. 2006).

Similarly, under the Constitution, "[a]n arrest based on probable cause cannot constitute an unreasonable . . . seizure within the meaning of the Fourth Amendment." <u>Carr v. District of Columbia</u>, 565 F. Supp. 2d 94, 99 (D.D.C. 2008) (citing <u>Whren v. United States</u>, 517 U.S. 806, 819 (1996)), *rev'd on other grounds by* 587 F.3d 401 (D.C. Cir. 2009). "Probable cause exists when 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person in believing that the suspect has committed, is committing, or is about to commit an offense.'" <u>Marcus v. District of Columbia</u>, 646 F. Supp. 2d 58, 61 (D.D.C. 2009) (quoting <u>United States v. Wesley</u>, 293 F.3d 541, 535 (D.C. Cir. 2002)).

Mr. Woods argues that no reasonable factfinder could have found him liable for either false or unconstitutional arrest because he "had probable cause, even in the constitutional sense, to arrest the [p]laintiff." Mot. at 5. The defendant asserts that Mr. Woods "observed Ms. Halcomb enter the station in a[n] [illegal] piggyback manner" and used the SMADS machine to "confirm[] . . . that Ms. Halcomb had not inserted her farecard into the faregate in order to move from the unpaid area to the paid area." Id. at 5-6. But those allegations are based solely on Mr. Woods' testimony, and since Mr. Woods was an interested party, the jury was not required to believe his assertions. See, e.g., Pitt v. District of Columbia, 558 F. Supp. 2d 11, 16 (D.D.C. 2008); District of Columbia v. Minor, 740 A.2d 523, 531 (D.C. 1999). Nor was the jury required to accept the authenticity of the farecard produced by Mr. Woods and identified as that of the plaintiff, since, again, all averments of such authenticity were made by Mr. Woods himself.

Taken in the light most favorable to the non-moving party, as it must be on a motion made under Rule 50 of the Federal Rules of Civil Procedure, the evidence presented at trial showed that Ms. Halcomb entered Union Station, inserted a paper farecard containing more than the minimum fare into a faregate, and entered the paid area of the station after the gate properly processed her card. The jury reasonably could have inferred from that evidence that Mr. Woods could have had no reasonable belief that Ms. Halcomb had committed the crime of fare evasion, and that his arrest of Ms. Halcomb therefore was not legally justified. Its verdicts in Ms. Halcomb's favor with regard to her claims of false arrest and unconstitutional arrest therefore were permissible and in accordance with the law.

*C. Assault and Battery*

"An assault is an intentional act and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim," while "[a] battery is an intentional act that causes a harmful or offensive bodily contact." Evans-Reid v. District of Columbia, 930 A.2d 930, 937 (D.C. 2007). The unreasonable use of force by a police officer may be an assault and battery under District of Columbia law, Hundley v. District of Columbia, 494 F.3d at 1101, but a police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the [officer] reasonably believes to be necessary." Scales v. District of Columbia, 973 A.2d 722, 730 (D.C. 2009) (internal quotation marks and citation omitted). As the jury was instructed: "A law enforcement officer may use only that amount of force reasonably necessary to arrest a person and to keep the arrested person in custody. An officer is not allowed to use force beyond that reasonably necessary to accomplish his lawful purpose." Jury Instructions at 57.

Based on the evidence presented at trial, Mr. Woods argues that any reasonable factfinder would have found that any force used against Ms. Halcomb was both necessary and reasonable, thus subject to a qualified privilege. Mot. at 8. To support this proposition, however, he again relies on evidence that the jury was not required to accept: "The uncontroverted evidence at trial was that Defendant found it necessary to request the assistance of Officer Spencer Pines to secure Ms. Halcomb in handcuffs. Therefore, Officer Woods not only proved his use of force was reasonable, but also that the force he employed was initially insufficient to overcome the Plaintiff's resistance." Id. The jury reasonably concluded that the evidence showed no such thing. Mr. Woods and Officer Pines did testify that Mr. Woods requested

Officer Pines' help in securing Ms. Halcomb, but, contrary to the defendant's assertion, that testimony was not uncontroverted. Ms. Halcomb testified that Officer Pines did not participate in her arrest, and the jury was free to believe her over the defendant and Officer Pines.

Furthermore, the jury specifically found in answer to a special interrogatory that Mr. Woods bent back Ms. Halcomb's fingers. According to Ms. Halcomb, that incident occurred *before* her arrest, when Mr. Woods attempted to gain access to her purse. By Ms. Halcomb's account, Officer Pines was not involved in that incident, nor did Ms. Halcomb pose any threat that would make the use of force against her at that point reasonable. Mr. Woods' assertion of qualified privilege therefore could reasonably have been rejected by the jury.

Mr. Woods also suggests that the jury's finding for Ms. Halcomb on her claims of assault and battery is "undermine[d]" by its finding against her on her claim of excessive use of force in violation of the Fourth Amendment. This argument is misplaced. The Court cannot and will not guess at what factual findings may have motivated the jury's verdict on the excessive force claim and then apply those assumed findings to its analysis of the assault and battery claims. If Mr. Woods believed the jury's verdict on the Fourth Amendment claim to be inconsistent with its findings on assault and battery, he should have moved for a new trial on the ground that those aspects of the verdict were irreconcilably inconsistent and evidence of unacceptable confusion on the part of the jury. See, e.g., Mazloum v. District of Columbia Metro. Police Dep't, 576 F. Supp. 2d 25, 42 (D.D.C. 2008) (ruling on the evidence presented in that case that a finding against an officer on a claim of excessive use of force in violation of the Fourth Amendment was inconsistent with a finding in his favor on a common law battery claim).

Mr. Woods cannot attempt to translate the jury's finding on the Fourth Amendment claim into a judgment in his favor on the common law claims.

### D. Punitive Damages

> Under the law of the District of Columbia:
>
> The test for punitive damages . . . is a rigorous one. [Punitive damages] are a form of punishment. Their purpose is to punish unlawful conduct and to deter its repetition. Punitive damages are, accordingly, to be awarded only in cases of outrageous or egregious wrongdoing where the defendant has acted with evil motive, actual malice, or in willful disregard for the rights of the plaintiff. In keeping with this high substantive burden, the plaintiff must prove egregious conduct and the requisite mental state by clear and convincing evidence.

Rosenthal v. Sonnenschein Nath & Rosenthal, LLP, 985 A.2d 443, 455-56 (D.C. 2009) (internal quotation marks and citation omitted).[7] "Clear and convincing evidence is evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." Wood v. Neuman, 979 A.2d 64, 73 (D.C. 2009) (internal quotation marks and citation omitted). The Court concludes that, even taken in the light most favorable to Ms. Halcomb, the evidence presented at trial could not suffice to produce in the mind of a reasonable

---

[7]     With respect to claims brought pursuant to 42 U.S.C. § 1983, "punitive damages . . . are available against . . . individual defendants where their conduct was 'motivated by evil motive or intent, or when it involve[d] reckless or callous indifference to the federally protected rights of others.'" Elkins v. District of Columbia, 527 F. Supp. 2d 36, 47 (D.D.C. 2007) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). The standard for the award of punitive damages under Section 1983 thus differs somewhat from the standard applicable under District of Columbia common law. Ms. Halcomb did not request a separate jury instruction on punitive damages under Section 1983, however; her requested instruction on punitive damages was based solely on District of Columbia law. See Jury Instructions at 86-89 (using Instruction 16-1 from the Standardized Civil Jury Instructions for the District of Columbia to explain the circumstances under which punitive damages can be awarded). The Court therefore applies the District of Columbia standard in determining whether punitive damages were available to Ms. Halcomb as a matter of law.

trier of fact "a firm belief or conviction" that Mr. Woods engaged in outrageous or egregious conduct "evincing malice or its equivalent." Pitt v. District of Columbia, 491 F.3d 494, 508 (D.C. Cir. 2007) (internal quotation marks and citation omitted).

Ms. Halcomb asserts that the jury reasonably could have assessed punitive damages based on a finding that any one or more of the following had occurred: (1) Mr. Woods threatened to "come to Ms. Halcomb's home and 'put a bullet in [her] head,'" Opp. at 24; (2) Mr. Woods "bent Ms. Halcomb's fingers back to access a driver's license in her wallet," id. at 25; (3) the defendant "violently placed Ms. Halcomb under arrest and performed a full-body search," "jamm[ing] his knee between Ms. Halcomb's legs, violently pull[ing] her necklace off, [and] searching her in an overly aggressive and physical manner," id. at 25, 27; (5) Ms. Halcomb was placed in a dirty cell at D.C. General Hospital and taken to two separate police precincts, id. at 25; and (6) Ms. Halcomb was subjected to "verbal assault from other prisoners" while she was in custody. Id.

As an initial matter, the Court notes that punitive damages are a remedy, not a claim; Ms. Halcomb cannot recover punitive damages for acts of Mr. Woods that could not as a matter of law form the basis for one of the legal claims on which the jury returned a verdict in the plaintiff's favor. See Iacangelo v. Georgetown Univ., 580 F. Supp. 2d 111, 113-14 (D.D.C. 2008) (pointing out that punitive damages are a remedy, not the basis for a free-standing legal claim). Thus, even if it is assumed that the jury believed Ms. Halcomb's testimony that Mr. Woods threatened to shoot her, that she was placed in a dirty cell, and that other prisoners mocked her, none of those findings could support an award for punitive damages, because none

could form the basis of one of the legal claims on which the jury returned a verdict in Ms. Halcomb's favor.

Ms. Halcomb's contention that Mr. Woods threatened to "put a bullet in [her] head" was presented to the jury as grounds for a finding of intentional infliction of emotional distress. The jury found in Mr. Woods' favor on that claim. The plaintiff in passing has suggested the possibility that the jury could have construed the alleged threat as an assault. See Opp. at 15. But that theory of the plaintiff's assault claim was never presented to the jury. Even if it had been, as a matter of law, the jury could not have found Mr. Woods' liable for assault on the basis of his threat, made while standing with Ms. Halcomb in D.C. General Hospital, that he ought to go out to her house and put a bullet in her head because she had caused him so much trouble. Under the common law of the District of Columbia, a threat "to cause physical harm or offensive contact with another person" only qualifies as an assault if it appears that "the person making the threat . . . has the *present ability* to carry out the harmful or offensive contact." STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA § 19.01 (2009) (emphasis added). See also Jury Instructions at 53-54. To constitute an assault, then, a threat must create a reasonable "apprehension of *immediate* offensive contact." Id. cmt. (citing Madden v. D.C. Transit System, Inc., 307 A.2d 756, 757 (D.C. 1973)) (emphasis added); see also Restatement (Second) of Torts § 22 (1965). The threat attributed to Mr. Woods in this case does not meet those criteria. According to Ms. Halcomb, Mr. Woods threatened action in the indefinite future while standing in front of the nurse's station at D.C. General Hospital, awaiting the arrival of a physician. Given those undisputed circumstances, a reasonable person could not have felt that offensive contact was imminent.

Because Mr. Woods' threat did not constitute an assault as a matter of law, and the jury found against Ms. Halcomb on her claim of intentional infliction of emotional distress, the threat cannot serve as a basis for punitive damages. Similarly, the fact that Ms. Halcomb was placed in an unpleasant cell at the hospital and taunted by other persons in custody cannot justify the award of punitive damages, because neither allegation, even if assumed to be true, provided a foundation for any of the legal claims that the jury decided in Ms. Halcomb's favor.

Despite the attempts of Ms. Halcomb's counsel to characterize her arrest as "violent" and "overly aggressive," the award of punitive damages must rest on the evidence presented at trial, not on counsel's characterization of it. Taken in the light most favorable to Ms. Halcomb, the evidence on the claims of assault and battery showed that Mr. Woods pulled on two of her fingers in an attempt to open or grab her purse; that he bruised her thighs while pushing her legs apart so that he could complete the search incident to arrest; and that he twisted her necklace when attempting to remove it, breaking it in the process. None of those acts is sufficiently egregious to demonstrate by clear and convincing evidence that Mr. Woods acted with the intent to injure Ms. Halcomb, nor can such an intent be inferred from surrounding circumstances.

Mr. Woods' bending of Ms. Halcomb's fingers, because it constituted a use of force not justified by any threat or reasonable law enforcement objective, could support a reasonable jury's finding of assault and battery. But the record contains no suggestion that Mr. Woods developed a sense of malice toward Ms. Halcomb prior to the finger-bending incident. Even according to Ms. Halcomb, Mr. Woods said nothing at the time of the incident to indicate malicious intent and the bending lasted for only a few seconds. The resultant injuries to Ms.

Halcomb's fingers — swelling and bruises — are too mild to serve as clear and convincing evidence, in and of themselves, that Mr. Woods aimed to hurt Ms. Halcomb by grabbing her fingers or that his conduct was egregious or outrageous. With so little evidence regarding Mr. Woods' motives, no reasonable factfinder could have reached a firm conclusion that Mr. Woods acted with malice.

In the same way, a finding that Mr. Woods had, as Ms. Halcomb claimed, bruised her thighs with his knee while searching her would not justify an award of punitive damages. A search incident to an arrest necessarily is a physical process; de minimis injuries such as bruises, while not to be condoned, at the same time do not demonstrate the existence of an intent to injure by clear and convincing evidence. Nor does Mr. Woods' breaking of Ms. Halcomb's necklace constitute egregious conduct or evidence of malice. According to Ms. Halcomb's own testimony, the necklace broke while Mr. Woods was looking for the fastener of the necklace and "turned" it in such a way that it "popped." Such a description indicates accident, not malice.

Finally, the plaintiff did not introduce any evidence tending to show that Mr. Woods willfully disregarded her rights when he arrested her. There is no evidence in the record to suggest that Mr. Woods knew or harbored malice toward Ms. Halcomb before he stopped her or that he believed her to be innocent of the crime for which he arrested her. It is true that Mr. Woods rejected Ms. Halcomb's claims of innocence and refused to show her the information the SMADS machine showed to be encoded on her farecard. By Ms. Halcomb's own account, however, Mr. Woods twice took her card to the kiosk where the SMADS machine was located to check that he had not made a mistake in stopping her. Of course, the jury was not required to believe that Mr. Woods did in fact check the SMADS machine once in the kiosk, or that the

machine showed that Ms. Halcomb had committed fare evasion. But in light of Ms. Halcomb's own admission that Mr. Woods appeared to go twice to check the card, the jury could not reasonably have found by clear and convincing evidence that he had been reckless with regard to Ms. Halcomb's Fourth Amendment right to be free of unreasonable searches and seizures.

In light of these considerations, the Court concludes that a reasonable jury could not have found by clear and convincing evidence, based on the evidence presented at trial and construed in the light most favorable to Ms. Halcomb, that Mr. Woods engaged in egregious, tortious conduct with a malicious state of mind. As a result, the jury's award of punitive damages will be set aside.

## IV. QUALIFIED IMMUNITY

Mr. Woods argues that he "has qualified immunity both for the arrest [of Ms. Halcomb] itself and for the limited amount of force necessary to effectuate the arrest." Mot. at 7. The second part of that contention is entirely unnecessary; although Mr. Woods, for reasons unknown, devotes much of his discussion of qualified immunity to the subject of excessive use of force, see Mot. at 13-14, the jury found in Mr. Woods' favor on that claim. See Verdict Form at 2. Qualified immunity is relevant only to those constitutional claims that were decided against Mr. Woods: unreasonable search and unreasonable arrest.

The defendant advances the mistaken and unsupported argument that "police officers possess qualified immunity from suit absent egregious circumstances." Mot. at 9. That contention misstates the law. As the court of appeals has noted:

> The Supreme Court has held that "government officials performing
> discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a reasonable
person would have known." Harlow v. Fitzgerald, 457 U.S. 800,
818 (1982); see also Wilson v. Layne, 526 U.S. 603, 614 (1999)
(holding that qualified immunity turns upon the "objective legal
reasonableness of the officers' action, assessed in light of the legal
rules that were clearly established at the time the action was taken"
(internal quotation marks and citation omitted)).

Pitt v. District of Columbia, 491 F.3d at 509. A defendant's entitlement to qualified immunity is

a question of law to be decided by the court, see id., although sometimes, as in this case, the facts

establishing what the challenged conduct was are legitimately in dispute and must first be

decided by the jury before the court answers the ultimate legal question whether a defendant is

entitled to qualified immunity. See Zellner v. Summerlin, 494 F.3d 344, 367-68 (2d Cir. 2007);

Halcomb v. Washington Metropolitan Area Transit Authority, 526 F. Supp. 2d 20, 22 (D.D.C.

2007). "Whether an official protected by qualified immunity may be held personally liable . . .

generally turns on the objective legal reasonableness of the action." Wilson v. Layne, 526 U.S.

603, 614 (1999). In assessing whether a party is entitled to qualified immunity, the facts must be

taken in the light most favorable to the party asserting the constitutional injury. See Saucier v.

Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)), rev'd on

other grounds by Pearson v. Callahan, 129 S.Ct. 808 (2009); see also Scott v. Harris, 550 U.S.

372, 377 (2007).

In this case, a violation of Ms. Halcomb's constitutional rights to be free from

unreasonable arrest and unreasonable search was found by the jury, and that finding remains

undisturbed by the Court. See supra at 11. The sole question remaining for decision is whether

Mr. Woods' arrest and search of Ms. Halcomb "'violate[d] clearly established constitutional

rights of which a reasonable person would have known.'" <u>Pitt v. District of Columbia</u>, 491 F.3d at 510 (brackets in original) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818).  Another formulation of this standard is "whether an objectively reasonable officer would have believed his conduct to be lawful, in light of clearly established law[.]"  <u>Id</u>. at 509-10; <u>see</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 197 (2004).

Unfortunately, Mr. Woods does not address the proper issue — whether "an objectively reasonable officer" would have believed Mr. Woods' conduct to be in accordance with clearly established law, <u>see</u> <u>Halcomb v. Washing Metropolitan Area Transit Authority</u>, 526 F. Supp. 2d at 22 — but instead attempts to relitigate the factual findings made by the jury and affirmed in this Opinion by the Court.  <u>See</u>, <u>e.g.</u>, Mot. at 12 (arguing that Mr. Woods' "eyewitness account" — which, again, the jury was not required to believe — provides proof of probable cause).  As already explained, the jury could reasonably have concluded that Mr. Woods arrested Ms. Halcomb for fare evasion even though she had properly inserted a farecard with a value greater than the minimum fare into the faregate at Union Station.  Such a finding could negate a claim of probable cause, establishing a constitutional violation.  Mr. Woods has not argued, much less established, that the constitutional law governing the existence of probable cause in such a situation is unclear.  He consequently has failed to show that he is entitled to qualified immunity.

## V.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the defendant's motion for judgment as a matter of law or, in the alternative, for a new trial.  The jury's award of punitive damages will be vacated, but the jury's verdict otherwise will remain

unchanged. Because the Court has not relied on any of the allegedly inappropriate arguments made in the defendant's reply to the plaintiff's opposition to the motion for judgment as a matter of law, the plaintiff's motion to strike that reply is denied as moot. An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:   March 3, 2011